

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

MATHEW THOYALIL

                    Plaintiff,

-against-

AUTOEXPO ENT. INC. and M&T BANK

                    Defendants.
-----------------------------------------------------------X

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Case No.:

CV 04 2023

HURLEY, J.
WALL, M.J.

Plaintiff, **MATHEW THOYALIL** ("Plaintiff") as and for his complaint against the above-captioned defendants, alleges as follows:

### INTRODUCTION

1. Plaintiff institutes this action for actual damages, statutory damages, attorneys fees, and the costs of this action against defendants AUTOEXPO ENT. INC. ("Dealer") and M&T BANK ("Bank")(collectively referred to herein as "Defendants") for multiple violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, (hereinafter TILA), and Federal Reserve Board Regulation Z, 12 C.F.R. § 226, promulgated pursuant thereto; the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C § 1691, et al.;

{00035268.DOC}

violations of the New York General Business Law, section 349; and for common law fraud.

## JURISDICTION

2. Jurisdiction is premised on 15 U.S.C. § 1640(e); 15 U.S.C. §1691e (f), 28 U.S.C. §§ 1331,1337, and under the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

## PARTIES

3. Plaintiff is an individual who resides in Suffolk County, New York.

4. Upon information and belief, Dealer is a corporation organized pursuant to the laws of New York State and resides in Nassau County at 46 Northern Blvd., Great Neck, NY.

5. Upon information and belief, Bank is a financial institution with its principal place of business at One M&T Plaza, Buffalo, NY, 14203.

## FACTUAL ALLEGATIONS

6. In or about December of 2003, Dealer placed an advertisement in the December 16-29th, 2003, edition of the "Auto Market of Suffolk County" (the "Advertisement").

7. The Advertisement offered for sale a used 2002 Mercedes Benz ML 320, with 25,000 miles (the "Mercedes") for $329 a month, at 5.9% APR for 60 months, with $3,000 down. The Advertisement stated that this financing was "subject to primary lender approval".

8. In response to the Advertisement, on or about December 31st, 2003, the Plaintiff visited Dealer's place of business to discuss purchasing the Mercedes on the terms set forth in the Advertisement.

9. The Dealer's salesman – "Raphy" - advised Plaintiff that the ML 320 pictured in the Advertisement was in fact available on the terms set forth in the Advertisement. Plaintiff asked Raphy if there was anything else he had to pay and Raphy advised that "tax" was extra and that it would bring the monthly payment to about $345. Based upon the Advertisment and these representations by Raphy, Plaintiff agreed to purchase the Mercedes.

10. Plaintiff provided Raphy with a $100 deposit towards the purchase of the Mercedes and Raphy advised Plaintiff that he would start the "paperwork". Raphy provided the Plaintiff with the VIN for the Mercedes and instructed Plaintiff to obtain an Insurance Card.

11. Raphy further advised the Plaintiff that Plaintiff could take delivery of the Mercedes as soon as he returns with the Insurance Card and the balance of the $3,000 downpayment.

12. On or about January 10th, 2004, Plaintiff, and his friend Samuel Abraham, returned to the Dealer's premises with the intent of completing the transaction and taking delivery of the Mercedes. Plaintiff brought with him the Insurance Card as well as the $2,900 balance of the down payment.

13. Upon arriving at the Dealer's premises, Plaintiff and Mr. Abraham met with Raphy and provided him with the Insurance Card. Plaintiff also advised Raphy that Plaintiff had the balance of the down payment. Raphy advised that he could not arrange for Plaintiff to take delivery of the Mercedes that day because the Mercedes needed a DMV inspection. Raphy also stated that the Mercedes had a dead battery and two of its tires were in poor condition. Raphy agreed to replace these parts and advised the

Plaintiff that he would start work on the paperwork. Raphy advised Plaintiff to return on January 14th at 3 PM, and that everything would be ready at that time.

14. At approximately 3PM on January 14th, 2004, the Plaintiff, his friend (Samuel Abraham), and Plaintiff's wife, returned to the Dealer's place of business to complete the transaction and take delivery of the Mercedes. They met with Raphy who advised that one of the Dealer's salesman named Ronny Eltan was handling the "paperwork" and that he was busy with other customers at that time.

15. At approximately 5:30 PM, Mr. Eltan had still not finished the "paperwork" and Plaintiff advised that he was going to leave, since Mr. Abraham needed to leave for a 6 PM appointment. Apparently sensing that he was going to lose the sale, Mr. Eltan advised Plaintiff that Mr. Abraham could leave with the Mercedes so long as Plaintiff signed blank versions of the "paperwork".

16. After receiving assurances from Mr. Eltan that the "paperwork" would be filled out with the purchase terms set forth in the Advertisement adjusted to $345 a month for tax, Plaintiff agreed and signed blank versions of the "paperwork", including a blank version of the Retail Installment Contract (the "RISC") annexed hereto as **Exhibit A**.

17. Plaintiff's friend – Mr. Abraham – left with the Mercedes and Plaintiff and his wife continued to wait for the paperwork.

18. Mr. Eltan returned with the paperwork in a sealed envelope at around 7 PM and Plaintiff left the Dealer's premises without opening the envelope or reviewing the "paperwork".

19. Upon arriving home that night, Plaintiff opened the envelope and reviewed the paperwork. to discover that the RISC contained payments that were approximately

twice as high as agreed and that Plaintiff would have to make 72 payments rather then the 60 payments reflected in the Advertisement.

20. The next morning, the Plaintiff contacted Mr. Eltan and advised Mr. Eltan that he had not agreed to the terms set forth in **Exhibit A**. Mr. Eltan responded by stating that the "Deal Is Over" and that he would not take back the Mercedes or revise the RISC to reflect the terms that were actually agreed upon by the parties.

21. Plaintiff then contacted his credit card company to dispute the $2,900 downpayment he placed on his credit card.

22. Despite corresponding with the Dealer on March 2nd, 2004, the Dealer by way of letter dated March 7th, 2004, continues to refuse to take back the Mercedes or revise the Retail Installment Contract to reflect the actual terms agreed upon by the parties.

## COUNT I
## MULTIPLE VIOLATIONS OF TILA

23. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-22, as if fully set forth at length herein.

24. At all times relevant hereto, the Dealer regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and is the person to whom the transaction which is the subject of this action is initially payable, making Dealer a creditor within the meaning of TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

25. 15 U.S.C. section 1638 provides that the creditor shall disclose the "amount financed", the "finance charge", the "annual percentage rate", as well as other items so that the consumer can make an informed decision regarding the credit being offered.

26. 15 U.S.C. section 1638 also governs the timing of these disclosures and prohibits any conduct that would prevent the consumer from having a meaningful opportunity to review the terms of the credit being offered.

27. The disclosures contained in the RISC signed by the Plaintiff, are inaccurate and false, and therefore violate the TILA and Regulation Z.

28. Dealer violated the TILA because none of the required disclosures were made to the Plaintiff at the time he executed the RISC due to the fact that the RISC was blank. Also, Plaintiff was never given a reasonable opportunity to review the terms of credit being offered, because the RISC was blank when he executed it, was filled out by the Dealer outside the presence of Plaintiff, and then was handed back to Plaintiff in a sealed envelope.

29. Dealer also violated the TILA by including hidden finance charges such as $1,995 for a theft protection program and a document fee of $944.75. None of these charges are itemized on the RISC as required by the TILA.

30. The Dealer also violated the TILA because the "Cash Price" on the RISC is blank, in violation of Regulation 226.17 ( c ).

31. Other disclosures on the RISC are also inaccurate. Plaintiff never agreed to a monthly payment of $646.74, nor did Plaintiff agree to an APR of 7.89%. Rather, the finance

{00035268.DOC}

terms given to Plaintiff were contained in the Advertisement, as modified to include sales tax.

32. As a result of these violations of the TILA, the Dealer is liable to the Plaintiff for actual damages; statutory damages equal to twice the finance charge; punitive damages, costs and attorney fees.

## COUNT II

## **VIOLATION OF ECOA**

33. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-32, as if fully set forth at length herein.

34. Dealer regularly extends or arranges for the extension, renewal or continuation of credit rendering the Dealer a "creditor" under 15 U.S.C. 1691-a(e).

35. Upon information and belief, the Dealer submitted a credit application on behalf of the Plaintiff to one or more lending institutions in order to determine whether such lending institutions would purchase a loan made by Dealer to Plaintiff for the purchase of the Mercedes, and if so, on what terms the lending institution would purchase the loan from the Dealer.

36. As such, Plaintiff was an "applicant" under 15 U.S.C. § 1691-a(b).

37. Upon information and belief, at least one lending institution rejected the assignment of a proposed loan, or rejected assignment of the actual loan, based upon the Plaintiff's credit application and/or credit report.

38. Dealer failed to provide notice in accordance with 15 U.S.C. § 1691(d), as implemented by 12 C.F.R. § 202.9(a)(2), that an adverse action had been taken with respect to the Plaintiff's credit application.

39. Accordingly, Dealer has violated the ECOA and, pursuant to 15 U.S.C. § 1691-e, Plaintiff may seek actual and statutory damages, as well as an award for reasonable attorneys' fees.

## COUNT III
## VIOLATION OF GBL 349

40. Plaintiff repeats and realleges each and every allegation set forth in paragraph 1-39 hereof.

41. Section 349 of the New York General Business Law prohibits the use of deceptive practices in connection with the sale of consumer oriented goods or services.

42. The Mercedes is a consumer oriented good, and the act of providing credit to purchase a consumer oriented good constitutes a consumer oriented service. The Dealer is in the business of selling and providing consumer oriented goods and services. In addition, the Dealer uses standard forms to conduct its business and effectuate the sale of the consumer oriented goods and services.

43. The Dealer represented that the Mercedes could be purchased for $345 ($329 plus the adjustment for sales tax) a month, for 60 months, at 5.9% APR, with $3000 down, subject to primary lender approval.

44. This representation was materially false and/or misleading since the Dealer failed to sell the Mercedes on said terms and continues to refuse to honor the terms as offered and agreed upon by the parties.

45. The representation was also materially false and/or misleading because upon information and belief, Dealer never intended to sell the Mercedes on said terms as Dealer either never offered the loan to a primary lender other then Bank, or the Dealer received approval for the loan at an interest rate less then 7.89% and marked up the interest rate and received what is known as a "Dealer's reserve" from the Bank. The Dealer's reserve is also known as a yield spread premium and represents the amount of interest the Dealer charges the consumer over and above the interest rate at which a lending institution is willing to purchase the loan from the Dealer.

46. The Dealer also made materially false and/or misleading representations when its salesman represented that he would insert the terms set forth in the Advertisement into the blank RISC.

47. The Dealer's false and/or misleading representations caused Plaintiff damages.

48. Plaintiff is entitled to recover his actual damages, or $50, whichever is greater, as well as attorney fees.

## COUNT IV

## FRAUD

49. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-48 hereof, as if fully set forth at length herein.

50. The Dealer never intended to offer the Mercedes for sale on the terms set forth in the Advertisement, thereby making the Advertisement false.

51. Upon information and belief, no primary lender was willing to buy a loan for the Mercedes on the terms set forth in the Advertisement and the Dealer knew this to be the case at the time it placed the Advertisement.

52. Upon information and belief, upon receiving Plaintiff's credit report, the Dealer knew that it could not sell the Mercedes to Plaintiff on the terms set forth in the Advertisement, yet falsely represented to Plaintiff that it would sell him the Mercedes on the terms set forth in the Advertisement adjusted for sales tax.

53. The Dealer falsely represented to Plaintiff that it would insert the terms of the Advertisement, adjusted for sales tax, into the blank RISC.

54. All of these representations were known to be false at the time they were made, or were made with reckless indifference.

55. Plaintiff was entitled to, and reasonably relied upon these representations to his detriment, and suffered damages as a result.

56. Due to the Dealer's fraudulent conduct, Plaintiff is entitled to rescind the RISC, and is entitled to damages as well as punitive damages.

## COUNT V

### LIABILITY OF BANK UNDER TILA

57. The Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1-56 of the complaint as if fully set forth at length herein.

58. The Bank is the assignee of the RISC.

59. The Bank has entered into a master loan agreement with the Dealer whereby the Dealer submits various documents, including a contract of sale ("Original Agreement and Bill of Sale dated 1/14/04), and a credit application, to the Bank for approval. These documents are referred to as a "loan package".

60. Once the Bank approves the loan, it has agreed, pursuant to the master loan agreement, to take assignment of the loan and the "loan package".

61. As per 15 U.S.C. 1641(a), the Bank is liable under TILA as an assignee because the TILA violations were evident on the face of the documents assigned to the Bank.

62. For example, the "Cash Price" on the RISC is blank, thereby making it evident to the Bank that a TILA violation had occurred.

63. Also, the Original Agreement and Bill of Sale contains a document fee and other charges that were not itemized on the RISC, as required by TILA, also making it evident to the Bank that a TILA violation had occurred.

64. As a result, the Bank is liable to the Plaintiff for actual damages; statutory damages equal to twice the finance charge; punitive damages, costs and attorney fees.

**WHEREFORE**, Plaintiff demands trial by jury and demands judgment from the Defendants for rescission, actual damages, statutory damages, punitive damages, attorney fees, expert witness fees and costs, as well as any other relief the Court deems just and proper.

Dated: New York, New York
       May 12th, 2004

_____
Douglas R. Hirsch (DRH-4172)
SADIS & GOLDBERG LLC
Attorneys For Plaintiff
463 Seventh Avenue, Suite 1601
New York, NY 10018
(212) 947-3793

{00035268.DOC}

Case 2:04-cv-02023-DRH-WDW   Document 1   Filed 05/17/04   Page 12 of 15 PageID #: 12

**Exhibit A**

FORM NYS23SLC-1 (Rev. 8/01)

RETAIL INSTALMENT CONTRACT (MOTOR VEHICLE - NY)

## M&T Bank

SIMPLE INTEREST
Dated 01/14/2004    Account # _____

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all scheduled payments. | Total Sale Price The total cost of your purchase on credit, including your downpayment of $3,000.00 |
|---|---|---|---|---|
| 7.89 % | $9,565.28 | $37,000.00 | $46,565.28 | $49,565.28 |

Your Payment Schedule will be:

| No. of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | $646.74 | Monthly, beginning 02/13/2004 |
| | $ | |

Filing Fees: $ N/A

Security: You are giving a security interest in the Vehicle being purchased.
Late Charge: If a payment is more than 10 days late, you will be charged 15% of the full payment amount.
Prepayment: If you pay off early, you will not have to pay a penalty.

See below and any other Contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.    e means estimate

In this Contract, we are the SELLER. Auto Expo Ent, Inc.
46 Northern Blvd, Great Neck, NY 11021
Name / Address / Zip Code

You are the BUYER(S). Mathew P. Thayalil
1840 Feuereisen Avenue, Ronkonkoma, NY 11779
Name(s) / Address(es) / Zip Code(s)

If there is more than one Buyer, each promises, separately and together, to pay all sums due us and to perform all agreements in this Contract.

VEHICLE: You have agreed to purchase, under the terms of this Contract, the following motor vehicle and its extra equipment, which is called the "Vehicle" in this Contract.

| N/U/D | Year and Make | Model | Body Style | No. Cyl. | Truck Ton Capacity | Vehicle Identification No. |
|---|---|---|---|---|---|---|
| Used | 2002 ME/BE | ML320 | Subn | V6 | | VIN#: 4JGAB54E22A291725 |

TRADE-IN:
You have traded in the following vehicle: N/A
Year and Make / Model

If a balance is still owing on the vehicle you have traded in, the Seller will pay off this amount on your behalf. You warrant and represent to us that any trade-in is free from liens, claims, encumbrances or security interests, except as shown in the "Cash Price, Downpayment and Trade-In" section as the amount of the "Lien Payoff".

PROPERTY INSURANCE: You are required to obtain and maintain insurance on the Vehicle, endorsed to protect us as loss-payee, BUT YOU MAY CHOOSE THE AGENT OR BROKER OF YOUR CHOICE. IF YOU FINANCE THE PROPERTY INSURANCE PREMIUM, COMPLETE THE FOLLOWING:

TITLE HOLDER OF COLLATERAL: N/A    REGISTRANT: N/A
PHYSICAL DAMAGE: Comprehensive $ N/A , deductible. Collision $ N/A , deductible.
INSURANCE COMPANY: N/A    Policy Number: N/A
Effective Date: N/A    Initial Term: N/A
AGENT: Name: N/A    Address: N/A    Telephone Number: N/A

You guarantee that the required insurance coverage as shown in the "Your Promises About Insurance" section was obtained from the agent named above. If you do not purchase insurance in this Contract, then liability insurance coverage for bodily injury and property damage is not included or provided for in this Contract.

VENDOR'S SINGLE INTEREST INSURANCE: ☒ If box is checked, we require Vendor's Single Interest Insurance. You may choose the person through whom Vendor's Single Interest Insurance is to be obtained. This insurance is for the sole protection of the Assignee and your interest is not covered. If obtained through us, the cost of such insurance is shown in the "Itemization of Amount Financed" in the box labeled "To VSI Insurance Company**".

CREDIT INSURANCE IS NOT REQUIRED: Credit Life Insurance, Credit Disability Insurance and Credit Involuntary Unemployment Insurance are not required to obtain credit and will not be provided unless you sign below and agree to pay the additional cost(s). Your insurance certificate or policy will tell you the MAXIMUM amount of insurance available. All insurance purchased will be for the term indicated.

By signing, you select Single Credit Life Insurance, which costs $ N/A    What is your age? N/A Yrs.
X N/A
Signature of Buyer to be Insured for Single Credit Life Insurance
Term: N/A

By signing, you select Single Credit Disability Insurance, which costs $ N/A    What is your age? N/A Yrs.
X N/A
Signature of Buyer to be Insured for Single Credit Disability Insurance
Insurer: N/A    Term: N/A

This Contract is between Seller and Buyer. All disclosures have been made by Seller. Seller intends to assign this Contract to the Assignee.

**Cash Price, Downpayment and Trade-In**
Cash Price
(including accessories, services and taxes)
$
Cash Downpayment
$ 3,000.00
Value of Trade-In
$ N/A
Lien Payoff
$ N/A
Lien Payoff to:
N/A

**Itemization of Amount Financed**
Unpaid Cash Price Balance
$
Amounts Paid to Others on Your Behalf*
License, Tags and Registration
$ N/A
To Credit Insurance Company
$ N/A
To VSI Insurance Company**
$ 37.00
To Property Insurance Company
$ N/A
To: N/A
$ N/A
To: _____
$ _____
To: N/A
$ N/A
To: N/A
$ N/A

**Other Amounts Financed**
To Seller for GAP Coverage
$ N/A

FOLLOWING: REGISTRANT: N/A
TITLE HOLDER OF COLLATERAL: N/A , deductible. Collision $ N/A , deductible.
PHYSICAL DAMAGE: Comprehensive $ N/A Policy Number: N/A
INSURANCE COMPANY: N/A Initial Term: N/A
Effective Date: N/A Address: N/A Telephone Number: N/A
AGENT: Name: N/A

You guarantee that the required insurance coverage as shown in the "Your Promises About Insurance" section was obtained from the agent named above. If you do not purchase Insurance in this Contract, then liability insurance coverage for bodily injury and property damage is not included or provided for in this Contract.

**VENDOR'S SINGLE INTEREST INSURANCE:** ☒ If box is checked, we require Vendor's Single Interest Insurance. You may choose the person through whom Vendor's Single Interest Insurance is to be obtained. This insurance is for the sole protection of the Assignee and your interest is not covered. If obtained through us, the cost of such insurance is shown in the "Itemization of Amount Financed" in the box labeled "To VSI Insurance Company**".

**CREDIT INSURANCE IS NOT REQUIRED:** Credit Life Insurance, Credit Disability Insurance and Credit Involuntary Unemployment Insurance are not required to obtain credit and will not be provided unless you sign below and agree to pay the additional cost(s). Your insurance certificate or policy will tell you the MAXIMUM amount of insurance available. All insurance purchased will be for the term indicated.

| To Credit Insurance Company | $ N/A |
| To VSI Insurance Company** | $ 37.00 |
| To Property Insurance Company | $ N/A |
| To: N/A | $ N/A |
| To: N/A | $ N/A |
| To: N/A | $ N/A |
| To: N/A | $ N/A |

**Other Amounts Financed**
To Seller for GAP Coverage $ N/A
For: N/A $ N/A
For: N/A $ N/A

**Amount Financed** $ 37,000.00

\* We may be retaining a portion of these amounts.

By signing, you select Single Credit Life Insurance, which costs $ N/A
What is your age? N/A Yrs.
X N/A
Signature of Buyer to be insured for Single Credit Life Insurance
Insurer: N/A Term: N/A

By signing, you select Single Credit Disability Insurance, which costs $ N/A
X N/A
Signature of Buyer to be insured for Single Credit Disability Insurance
What is your age? N/A Yrs.
Insurer: N/A Term: N/A

By signing, you both select Joint Credit Life Insurance, which costs $ N/A
1. X N/A
2. X N/A
Signatures of both Buyers to be insured for Joint Credit Life Insurance
What are your ages? N/A Yrs. N/A Yrs.
Insurer: N/A Term: N/A

By signing, you both select Joint Credit Disability Insurance, which costs $ N/A
1. X N/A
2. X N/A
Signatures of both Buyers to be insured for Joint Credit Disability Insurance
What are your ages? N/A N/A  Percentage to be insured N/A % N/A %
Insurer: N/A Term: N/A

By signing, you select Single Credit Involuntary Unemployment Insurance, which costs $ N/A
X N/A
Signature of Buyer to be insured for Single Credit Involuntary Unemployment Insurance
What is your age? N/A Yrs.
Insurer: N/A Term: N/A

By signing, you both select Joint Credit Involuntary Unemployment Insurance, which costs $ N/A
1. X N/A
2. X N/A
Signatures of both Buyers to be insured for Joint Credit Involuntary Unemployment Insurance
What are your ages? N/A N/A  Percentage to be insured N/A % N/A %
Insurer: N/A Term: N/A

**DEBT CANCELLATION COVERAGE IS NOT REQUIRED:** Debt Cancellation Coverage provides for the cancellation of your liability for amounts you owe under this Contract in excess of the value of the Vehicle in the event of a total loss of the Vehicle. This is sometimes called "GAP" coverage. GAP coverage is not required to obtain credit and will not be provided unless it is offered and you sign a separate GAP Notice requesting GAP coverage, which means you want GAP coverage and agree to pay the additional cost disclosed in the "Itemization of Amount Financed".

**ASSIGNEE:** We intend to assign this Contract and Security Agreement to the Assignee named in this provision. If the Assignee assigns the Contract to a subsequent assignee, the term also refers to such subsequent assignee. After the assignment, all rights and benefits of the Seller in this Contract and in the Security Agreement shall belong to and be enforceable by the Assignee.

The Assignee's name and address is:

**M&T BANK
Installment Loan Operations
One Fountain Plaza, P.O. Box 767
Buffalo, New York 14240**

**CO-SIGNER:** Any person signing the Co-Signer's Agreement below promises separately and together with all Co-Signer(s) and Buyer(s), to pay all sums due and to perform all agreements in this Contract. Co-Signer will not be an Owner of the Vehicle.

**CO-OWNER:** Any person signing the Co-Owner's Security Agreement below gives us a security interest in the Vehicle and agrees separately and together with all Co-Owner(s) and Buyer(s) to perform all agreements in the Security Agreement and all other parts of this Contract except the "Promise to Pay" section.

**TERMS:** The terms shown in the boxes above are part of this Contract.

**PROMISE TO PAY:** You agree to pay us the Total Sale Price for the Vehicle in U.S. funds by making the Total Down Payment, and paying us the Amount Financed plus the credit service charge (called "interest" in this Contract) at the Annual Percentage Rate shown above. You promise to make payments in accordance with the Payment Schedule. You promise to make payments on or before the same day of each month as the first payment due date. You agree to pay all other amounts which may become due under the terms of this Contract. You agree to make payments at the place or to send payments to the address which the Assignee most recently specifies in the written notice to you.

**SECURITY AGREEMENT:** To secure the payment of all sums due and the performance of all required obligations under this Contract, you give us a security interest in the Vehicle in all parts (called "Accessions") attached to the Vehicle at any later time, and in all proceeds of the Vehicle, including insurance proceeds.

**ADDITIONAL TERMS AND CONDITIONS:** THIS CONTRACT CONTINUES ON THE REVERSE SIDE. YOU ARE OBLIGATED TO ALL THE TERMS OF THE CONTRACT WHICH APPEAR ON THE FRONT AND REVERSE SIDES.

**NOTICE TO THE BUYER:** 1. Do not sign this Contract before you read it or if it contains any blank space. 2. You are entitled to a completely filled-in copy of this Contract. 3. Under the law, you have the right to pay off in advance the full amount due. If you do so, you may, depending on the nature of the credit service charge, either (a) prepay without penalty, or (b) under some circumstances obtain a rebate of the credit service charge. 4. According to law you have the privilege of

| By signing, you both select Joint Credit Life Insurance, which costs $ __N/A__ | What are your ages? | By signing, you both select Joint Credit Disability Insurance, which costs $ __N/A__ | What are your ages? | Percentage to be insured | $ __N/A__ Amount Financed |
|---|---|---|---|---|---|
| 1. X __N/A__ | __N/A__ Yrs. | 1. X __N/A__ | __N/A__ | __N/A__ % | $ __37,000.00__ |
| 2. X __N/A__ | __N/A__ Yrs. | 2. X __N/A__ | __N/A__ | __N/A__ % | * We may be retaining a portion of these amounts. |

Signatures of both Buyers to be Insured for Joint Credit Life Insurance

Signatures of both Buyers to be Insured for Joint Credit Disability Insurance

Insurer: __N/A__    Term: __N/A__          Insurer: __N/A__    Term: __N/A__

| By signing, you select Single Credit Involuntary Unemployment Insurance, which costs $ __N/A__ | What is your age? __N/A__ Yrs. | By signing, you both select Joint Credit Involuntary Unemployment Insurance, which costs $ __N/A__ | What are your ages? | Percentage to be insured |
|---|---|---|---|---|
| X __N/A__ | | 1. X __N/A__ | __N/A__ | __N/A__ % |
| | | 2. X __N/A__ | __N/A__ | __N/A__ % |

Signature of Buyer to be insured for Single Credit Involuntary Unemployment Insurance

Signatures of both Buyers to be insured for Joint Credit Involuntary Unemployment Insurance

Insurer: __N/A__    Term: __N/A__          Insurer: __N/A__    Term: __N/A__

**DEBT CANCELLATION COVERAGE IS NOT REQUIRED:** Debt Cancellation Coverage provides for the cancellation of your liability for amounts you owe under this Contract in excess of the value of the Vehicle in the event of a total loss of the Vehicle. This is sometimes called "GAP" coverage. GAP coverage is not required to obtain credit and will not be provided unless it is offered and you sign a separate GAP Notice requesting GAP coverage, which means you want GAP coverage and agree to pay the additional cost disclosed in the "Itemization of Amount Financed".

**ASSIGNEE:** We intend to assign this Contract and Security Agreement to the Assignee named in this provision. If the Assignee assigns the Contract to a subsequent assignee, the term also refers to such subsequent assignee. After the assignment, all rights and benefits of the Seller in this Contract and in the Security Agreement shall belong to and be enforceable by the Assignee.
The Assignee's name and address is:

**M&T BANK**
**Installment Loan Operations**
**One Fountain Plaza, P.O. Box 767**
**Buffalo, New York 14240**

**CO-SIGNER:** Any person signing the Co-Signer's Agreement below promises separately and together with all Co-Signer(s) and Buyer(s), to pay all sums due and to perform all agreements in this Contract. Co-Signer will not be an Owner of the Vehicle.

**CO-OWNER:** Any person signing the Co-Owner's Security Agreement below gives us a security interest in the Vehicle and agrees separately and together with all Co-Owner(s) and Buyer(s), to perform all agreements in the Security Agreement and all other parts of this Contract except the "Promise to Pay" section.

**TERMS:** The terms shown in the boxes above are part of this Contract.

**PROMISE TO PAY:** You agree to pay us the Total Sale Price for the Vehicle in U.S. funds by making the Total Down Payment, and paying us the Amount Financed plus the credit service charge (called "interest" in this Contract) at the Annual Percentage Rate shown above. You promise to make payments in accordance with the Payment Schedule. You promise to make payments on or before the same day of each month as the first payment due date. You agree to pay all other amounts which may become due under the terms of this Contract. You agree to make payments at the place or to send payments to the address which the Assignee most recently specifies in the written notice to you.

**SECURITY AGREEMENT:** To secure the payment of all sums due and the performance of all required obligations under this Contract, you give us a security interest in the Vehicle, in all parts (called "Accessions") attached to the Vehicle at any later time, and in any proceeds of the Vehicle, including insurance proceeds.

**ADDITIONAL TERMS AND CONDITIONS:** THIS CONTRACT CONTINUES ON THE REVERSE SIDE. YOU ARE OBLIGATED TO ALL THE TERMS OF THE CONTRACT WHICH APPEAR ON THE FRONT AND REVERSE SIDES.

**NOTICE TO THE BUYER:** 1. Do not sign this Contract before you read it or if it contains any blank space. 2. You are entitled to a completely filled-in copy of this Contract. 3. Under the law, you have the right to pay off in advance the full amount due. If you do so, you may, depending on the nature of the credit service charge, either (a) prepay without penalty, or (b) under some circumstances obtain a rebate of the credit service charge. 4. According to law you have the privilege of purchasing the insurance on the motor vehicle provided for in this Contract from an agent or broker of your own selection.

By signing below, we agree to sell the Vehicle to you under the terms of this Contract.

SELLER X __Auto Expo Ent., Inc.__

BY: __[signature]__ (SEAL) __01/14/04__ Date

You hereby acknowledge receipt of a copy of this Contract.
**RETAIL INSTALMENT CONTRACT**

BUYER X __Malvin Hall__ (SEAL) __1/14/04__ Date

BUYER X __N/A__ (SEAL) __N/A__ Date

---

**CO-SIGNER NOTICE**

You agree to pay the debt identified above, although you may not personally receive any property, services or money. You may be sued for payment, although the person who receives the property, services or money is capable of paying the debt. You should know that the Total of Payments listed above does not include Finance Charges resulting from delinquency, late charges, repossession or foreclosure costs, court costs or attorney's fees, or other charges that are stated in the Contract. You will also have to pay some or all of these costs and charges as required by the terms of the Contract. This notice is not the writing that obligates you to pay the debt. You have read the Retail Instalment Contract, which contains the exact terms of your obligation, and the Co-Signer(s) Notice.

You have been given a completed copy of this Notice and each writing that obligates you or the Buyer on this Contract.

X __N/A__                                        X __N/A__
Signature of Co-Signer          Date              Signature of Co-Signer          Date

**CO-SIGNER:** YOU SHOULD READ THE NOTICE TO CO-SIGNER ABOVE, BEFORE SIGNING THE CO-SIGNER'S AGREEMENT.
CO-SIGNER'S AGREEMENT: You, the person for personal signing below as "Co-Signer", promise to pay to us all sums due on this Contract and to perform all agreements in this Contract